***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, receive further evidence, and having reviewed the competent evidence of record, the Full Commission hereby affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner as modified below.
 *********** ADDITIONAL EVIDENCE
Plaintiff has filed a motion to consider additional evidence which consists of copies of checks for payment of benefits by defendant-carrier to plaintiff. Having considered plaintiff's motion and having reviewed the tendered evidence, the Full Commission grants plaintiff's request and the checks are admitted into evidence.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as an executed Pre-Trial Agreement, as
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. The Hartford Insurance Company provided defendant-employer with workers' compensation coverage at all relevant times herein.
4. Plaintiff's average weekly wage was $440.00 per week, yielding a compensation rate of $293.35 at all relevant times herein.
5. Plaintiff suffered a compensable injury by accident while in the course and scope of her employment with defendant-employer on August 2, 1997. Defendants accepted the compensability of said claim when they filed a Form 60 dated September 17, 1997, and when they began to pay workers' compensation benefits to plaintiff commencing August 26, 1997.
6. Plaintiff began part-time employment at reduced earnings with another employer on September 8, 1997, and plaintiff continues to be employed in a part-time capacity at the reduced earnings.
7. Plaintiff received and defendants paid partial disability benefits in the amount of $176.86 for the period of September 8, 1997 through September 10, 1997, and 17 weeks of temporary total disability benefits at the weekly rate of $403.35 from September 11, 1997 through January 7, 1998.
8. Plaintiff agrees that there was an overpayment of compensation during the period from September 8, 1997 through January 7, 1998.
9. The issues to be determined from this hearing is whether plaintiff is entitled to any additional workers' compensation benefits.
 ***********
The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all of the competent evidence adduced at the hearing and from the record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff was a forty-two year old woman at the time of the deputy commissioner hearing. She has completed high school.
2. For approximately two and one-half years prior to her employment with defendant-employer, plaintiff was employed by Dr. Peter Robie and in this position she handled patient accounts, patient billing, insurance billing, insurance payments, and all of the front desk duties. Plaintiff's work schedule with Dr. Robie was flexible. He allowed her to take her lunch at different times and to leave work to pick up her daughter. In the summer, Dr. Robie would allow plaintiff to work less, and spend more time with her daughter, depending on his patient schedule.
3. On July 1, 1997, plaintiff began to work for defendant-employer because defendant-employer purchased Dr. Robie's medical practice. Plaintiff was paid at the rate of $11.00 per hour for a forty-hour work week. The work hours for defendant-employer were more rigid. Plaintiff was expected to work a forty hour week with set times for lunch and without the luxury of being able to leave for personal errands and to pick up her daughter such as plaintiff had enjoyed with Dr. Robie. Plaintiff would not have the flexibility in work hours with the new employer as she had with Dr. Robie.
4. Prior to August 2, 1997, plaintiff did not have any physical difficulties with her low back or left hip, nor did plaintiff have any difficulties performing her job.
5. On August 2, 1997, plaintiff was lifting a stack of charts from the floor and turning with a twisting motion when she heard a loud pop coming from her lower back and/or left hip. She felt immediate low back and left hip pain causing her to be unable to continue working that day. Brenda Foster, plaintiff's co-worker, was working with plaintiff at the time of her injury and Ms. Foster heard a pop as plaintiff was picking up a stack of charts off the floor. Ms. Foster asked plaintiff if she was all right after hearing the pop and plaintiff said no.
6. On August 2, 1997, plaintiff's employment was still physically located in Dr. Robie's office, which was due to close soon and be consolidated into defendant-employer's practice.
7. Plaintiff returned to work on August 4, 1997 at which time she told Dr. Robie of her injury. She was in pain and was walking with a limp as a result of the pain. Plaintiff was unable to sit for prolonged periods of time or work the full day. When plaintiff's condition did not improve, Dr. Robie told plaintiff that she should see her doctor.
8. Plaintiff was seen by Dr. Sara Neal on August 19, 1997. Plaintiff told Dr. Neal that she had heard a pop and felt a pull in her left hip causing pain as well as a burning sensation down the back of her leg. Additionally, sitting and standing for a long period of time exacerbated her symptoms. Dr. Neal suspected plaintiff was suffering from a hip strain. She placed plaintiff on voltaren and physical therapy, and wrote plaintiff out of work from August 19, 1997 through September 10, 1997. Plaintiff indicated to Dr. Neal that she could bring paper work home and do it while she was lying down. According to plaintiff, Dr. Neal indicated that this was fine, although Dr. Neal would write the note to keep her off work pending treatment.
9. Plaintiff testified that her husband would pick up paper work that she could perform at home while she was off from work under Dr. Neal's direction.
10. Plaintiff obtained relief from the treatment given to her by Dr. Neal. On August 26, 1997, Dr. Neal wrote a letter to defendant-employer which stated:
 "I will write her out of work for the next two weeks, starting on the 26th of August and ending on September 10th, with return expected to work on September 11th. If she feels improved, she may return on September 2, 1997. Hopefully, with this rest and continued physical therapy and nonsteroidal agents, she will return to her normal state of health."
Plaintiff did not return to Dr. Neal on or near September 10, 1997, to extend her excuse from work or to receive restrictions concerning her working ability.
11. Plaintiff saw Howard Jones, M.D., occupational medicine, on September 8, 1997, at the request of defendant-employer. In a report dictated on September 9, and transcribed on September 10, 1997, Dr. Jones reported that plaintiff was experiencing left dip discomfort that appeared to be consistent with a resolving sprain. Dr. Jones released plaintiff to return to work with the restriction that she be allowed to alternate between sitting and standing. Plaintiff was to report to her supervisor to discuss whether her restrictions could be accommodated. Dr. Jones did not restrict the number of hours that plaintiff was permitted to work. Plaintiff was to return to Dr. Jones on September 17, 1997, at which time Dr. Jones would determine whether to refer plaintiff to a subspecialist. Plaintiff did not return to Dr. Jones.
12. After plaintiff was released to limited duty by Dr. Jones, plaintiff met with Nancy Mehaffey the office manager for defendant-employer concerning her return to work. Plaintiff and Ms. Mehaffey's testimony differs as to the precise details of this conversation, their understanding of plaintiff's condition, the purpose for the conversation, and defendant-employer's ability to accommodate plaintiff's condition. Plaintiff testified that Ms. Mehaffey informed her that she did not have permission to make plaintiff's job a part-time position, that the position was a forty-hour job. Plaintiff testified that because they could not accommodate her request to work part-time, she assumed that she would not be able to change her work position from a seated to a standing position, as necessary and, therefore, she felt compelled to resign. It was plaintiff's impression that if she could not work a forty-hour week, defendant-employer had no position for her.
13. After the meeting with Ms. Mehaffey, plaintiff wrote a resignation letter, dated September 8, 1997, and effective September 8, 1997, to Dr. Robie and Ms. Mehaffey. In this letter, the plaintiff gave the following reasons for her resignation:
 "Dr. Robie, as you know I have worked for you for the past 2 years as your office manager. . . . [n]ow that you have sold to Aegis I do not feel that I can continue to work for you (Aegis). I do not wish to be a check-out clerk and do not feel that that position would utilize my abilities. Also, I have been out of work due to a work-related injury since mid-August and no one has felt it necessary to call and show concern for my well being."
Contrary to plaintiff's testimony, her resignation letter expressed her discontent for the new position rather than her employer's inability to accommodate her physical limitations as the reason for her resignation. Plaintiff did not return to work for defendant-employer after September 8, 1997.
14. Ms. Mehaffey explained that plaintiff was offered the position of Medical Receptionist Two, which is a clerical position where plaintiff would process patients at the end of their visit with the physician. The position required plaintiff to receive a superbill from the patient, enter the data in the computer system, and, if necessary, schedule a return visit for the patient. Plaintiff could sit or stand as she felt necessary. Ms. Mehaffey indicated that defendant-employer had light duty work available, and that plaintiff's regularly scheduled work would be light duty. Further, part-time or reduced time work was available if it were prescribed by plaintiff's physician. Before plaintiff was injured, plaintiff had asked Ms. Mehaffey if she could work a flexible schedule like she had worked with Dr. Robie. Ms. Mehaffey explained that defendant-employer did not operate that way and that the position plaintiff had accepted did not include the flexible schedule that she was seeking.
15. Concerning the meeting with plaintiff on September 8, 1997, Ms. Mehaffey testified that plaintiff did not request to work light duty and did not provide her with any work restrictions or a return to work slip. Ms. Mehaffey explained that plaintiff came to her office and raised the possibility of her returning to work. Ms. Mehaffey was under the impression that plaintiff would be returning to work shortly. Plaintiff desired to know the details of the Medical Receptionist Two position, and Ms. Mehaffey explained that they would still have the forty-hour position available for plaintiff when she was ready to return to work. Plaintiff asked about the flexible schedule that she had worked with Dr. Robie and was again advised that her regular job was a forty-hour position and that they could not accommodate the work schedule that she formerly had with Dr. Robie. Plaintiff indicated that would present child care or other problems for her. Ms. Mehaffey stated that she could accommodate the hours on a short-term basis for injury purposes, but that she could not work a flexible schedule on a long-term basis. At this meeting with plaintiff, Ms. Mehaffey was not provided with the limited duty release from Dr. Jones. Ms. Mehaffey was not aware of any medical restrictions on plaintiff's return to work, and her discussion with plaintiff did not concern light duty, need to alternate between a sitting or standing position, or other limited return to work. The discussions concerned the nature of the position that was available to plaintiff when she had recovered from her injury.
16. Ms. Mehaffey's description of the September 8, 1997, conversation with plaintiff is consistent with defendant-employer's personnel records which indicated that plaintiff saw Dr. Jones on September 8 and that "no report [was] available yet." Further, the personnel records indicate that plaintiff's resignation letter was mailed on September 8 and received on September 10, 1998.
17. On September 8, 1997, the same day that plaintiff met with Ms. Mehaffey and she resigned from work, plaintiff testified that she filled out an application and started to work for Physical Data Service. Plaintiff learned of the job through one of her neighbors. Plaintiff told her neighbor that she could work part-time. Plaintiff accepted work with Physical Data Service and has continued in this position on a part-time basis. In contrast to plaintiff's testimony, however, the application for employment with Physical Data Service was dated August 28. When confronted with this fact, plaintiff admitted that she had discussed the position with her neighbor and gave her the application in August to hold in case her position with defendant-employer did not work out.
18. On September 8, 1997, none of plaintiff's physicians had restricted her to part-time or less than full duty work. As stated above, the August 26, 1997, letter from Dr. Neal allowed plaintiff to return to work on September 10, 1997, or sooner, and indicated that plaintiff should be at her "normal state of health" at that time. Dr. Neal's letter did not suggest that plaintiff's return to work would be part-time. Further, although Dr. Jones advised plaintiff to be able to alternate between sitting and standing, as needed, his restrictions did not preclude plaintiff from working forty-hours per week. The flexible schedule, or less than full time return to work, was the suggestion of plaintiff and was not recommended by her physicians at the time that she voluntarily resigned from work. Further, the request to work a flexible schedule, less than forty hours, was made by plaintiff before her injury and was not made because of the injury.
19. Although plaintiff testified that she assumed that Ms. Mehaffey was indicating that defendant-employer had no light duty work available, the greater weight of the credible evidence is that no meaningful conversation occurred concerning defendant-employer's ability to accommodate the work restriction placed on plaintiff by Dr. Jones or any other doctor. Rather, the greater weight of the evidence is that plaintiff desired a flexible work schedule similar to what she had with Dr. Robie before he sold his practice and voluntarily choose to accept other, part-time work, rather than to return to the employ of defendant-employer.
20. Thereafter, plaintiff began to work for Physical Data Services on September 8, 1997, as a medical information intake representative. This was a part-time position, which paid $9.00 per hour. In this position plaintiff was able to sit or stand as necessary and she was given flexible hours.
21. On September 10, 1997, defendants completed the Form 19 and Form 60 acknowledging plaintiff's injury of August 2, 1997, accepting the claim as being compensable, indicating that plaintiff's disability began on August 19, 1997, and showing that plaintiff's average weekly wage was $605.00 per week with the compensation rate being $403.35 per week and the compensation beginning August 26, 1997. The Form 19 also indicated that plaintiff had resigned.
22. On September 17, 1997, plaintiff's statement was taken by the defendant-carrier. Plaintiff described her medical condition and treatment she was receiving as a result of her injuries. Plaintiff told the adjuster that her doctor had released her to return to work with restrictions including the need to sit or stand as necessary. She told the adjuster that defendant-employer had offered her a job that she did not believe she could do. Plaintiff expressed that the job required sitting and was budgeted for full time. Plaintiff stated that she quit her job because she would not be able to do the work. The insurance adjuster asked plaintiff whether she was "currently working." Plaintiff answered "no," although she was working for Physical Data Service.
23. Plaintiff was sent by defendants to see Dr. Frank Rowan, an orthopedic surgeon. Dr. Rowan provided treatment to plaintiff from October 2, 1997, through January 27, 1998. Dr. Rowan diagnosed plaintiff's condition as low back and hip injuries and prescribed anti-inflammatories and physical therapy. Dr. Rowan initially assigned plaintiff to light duty with the restrictions of no lifting greater than 10 pounds, no prolonged standing, walking or sitting, and changes of position from sitting to standing. Dr. Rowan was under the mistaken belief that plaintiff was still working for Dr. Robie, and he made repeated entries in his notes about plans to return plaintiff back to light duty with defendant-employer and questioned why the defendants could not provide light duty work for plaintiff which is what plaintiff had informed him. In his deposition, Dr. Rowan explained that he was not aware that plaintiff had resigned from her employment in September, 1998. Further, Dr. Rowan was not aware that plaintiff was working elsewhere part-time. Plaintiff had led Dr. Rowan to believe that she was still employed with Dr. Robie and that she was not working.
24. On December 24, 1997, Dr. Rowan released plaintiff to perform her regular work with the restriction that she be able to change positions, as necessary. Dr. Rowan indicated that the reason for the change in restrictions was his belief that defendant-employer did not have light duty available. Dr. Rowan was not aware that plaintiff had voluntarily resigned from defendant's employ when he gave this release.
25. Dr. Rowan released plaintiff to return to her regular job with no restrictions on January 27, 1998. Dr. Rowan noted that plaintiff had a 0% permanent partial disability rating as a result of her compensable injury by accident. Although plaintiff continued to express pain and discomfort, Dr. Rowan explained that there was no anatomical explanation for her pain and that he could not relate her symptoms to the compensable injury.
26. Plaintiff has continued to complain of pain and, rather than returning to Dr. Rowan, she returned to Dr. Neal. On February 5, 1998, plaintiff was seen by Dr. Neal for pain. Dr. Neal continues to treat plaintiff as a result of her continuing subjective complaints of pain and she is of the opinion that plaintiff is in need of continuing medical treatment and that plaintiff has not reached maximum medical improvement.
27. On January 7, 1998, defendants terminated plaintiff's workers' compensation benefits without first applying to the Industrial Commission and receiving permission to terminate plaintiff's benefits. Defendants filed a Form 28T dated January 7, 1998, which incorrectly indicated that plaintiff had returned to work on August 28, 1997 at the same or greater wages. Defendants paid plaintiff temporary total disability benefits from August 19, 1997 through January 7, 1998.
28. The parties have stipulated into evidence documentation of plaintiff's reduced earnings from September 8, 1997 through November 1, 2000. Plaintiff agrees that there was an overpayment of compensation during the period from September 8, 1997 through January 7, 1998.
29. Plaintiff sustained an injury by accident on August 2, 1997, while in the course and scope of her employment. The injury consisted of a strain to the left hip and SI joint. The Full Commission accepts as credible the testimony of Dr. Rowan that plaintiff reached maximum medical improvement with a zero percent impairment rating on January 27, 1998, and that plaintiff's complaints of pain are not anatomically related to her compensable injury. On these issues the Full Commission gives greater weight to Dr. Rowan, the board certified orthopaedic surgeon, as a more competent physician from the point of education, training, and experience in the type of injury that plaintiff has sustained than to Dr. Neal, who is a family practitioner.
30. Having reviewed the medical and lay testimony, together with the medical records and documentary evidence, the Full Commission finds that plaintiff refused suitable employment when she voluntarily resigned on September 8, 1997, rather than reporting to work for defendant-employer on or about September 9 or 10, 1997. The Full Commission gives greater weight to the testimony of Ms. Mehaffey concerning the conversations with plaintiff and the willingness and ability of defendant-employer to accept plaintiff back to work with the acknowledged work limitations. The Full Commission gives less weight to the testimony of plaintiff and finds that plaintiff's credibility was seriously challenged by her failure to advise the insurance adjuster and Dr. Robie that she was working. The greater weight of the evidence is that plaintiff did not want to work the forty-hour work schedule offered by defendant, that she wanted to work a more flexible schedule as she had enjoyed with Dr. Robie, and that plaintiff voluntarily resigned from defendant-employer because she did not want to work the offered work schedule. Further, the evidence is that the employment offered to plaintiff was light-duty and was within plaintiff's restrictions. Plaintiff has failed to establish that she is totally or partially disabled after she reached maximum medical improvement on January 27, 1998.
31. Therefore, plaintiff was not entitled to compensation after she refused suitable employment. Defendant, however, may not obtain a credit because there are no future benefits from which to withhold the overpayment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident while in the course and scope of her employment with defendant-employer on August 2, 1997. N.C.G.S. § 97-2(6). As a result of plaintiff's injury, she became totally disabled from August 19, 1997 through September 7, 1997. N.C.G.S. § 97-29.
2. Plaintiff's average weekly wage was $440.00 per week, yielding a compensation rate of $293.35 per week.
3. Plaintiff was offered suitable employment by defendant-employer on September 8, 1997, and the same was unjustifiably refused; therefore, plaintiff is not entitled to compensation after September 10, 1997, when her remain off from work skip from Dr. Neal expired. N.C.G.S. § 97-32.
4. As plaintiff reached maximum medical improvement on January 27, 1998, and has not established disability due to her injury after that date she is not entitled to benefits pursuant to Sections 97-29, 97-30, or 97-31 of the Act.
5. The greater weight of the medical evidence is that plaintiff has reached maximum medical improvement with a zero percent (0%) impairment rating and thereby plaintiff has failed to demonstrate that she is in need of further medical attention for the compensable injury. N.C.G.S. § 97-25.
 ***********
Considering the foregoing findings of fact and conclusions of law, the Full Commission makes the following
 AWARD
1. Plaintiff's claims for additional indemnity and medical benefits are DENIED.
2. The parties shall pay their own costs.
 S/_____________________________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_____________________________ BUCK LATTIMORE CHAIRMAN
DISSENTING WITHOUT A WRITTEN DISSENT:
S/_____________________________ THOMAS J. BOLCH COMMISSIONER